24-20326 Nova Scotia Health Employees Pension Plan v. McDermott Intl McDonald 24-20326 Nova Scotia Health Employees Pension Plan v. McDonald 24-20326 Nova Scotia Health Employees Pension Plan v. McDonald 24-20326 Nova Scotia Health Employees Pension Plan v. McDermott 24-20326 Nova Scotia Health Employees Pension Plan v. McDonald 24-23426 Nova Scotia Health Employees Pension Plan v. McDermott 24-20326 Nova Scotia Health Employees Pension Plan v. McDermott 24-20326 Nova Scotia Health Employees Pension Plan v. McDermott 34-20327 Nova Scotia Health Employees Pension Plan v. McDermott 34-20327 Nova Scotia Health Employees Pension Plan v. McDermott 35-20327 Nova Scotia Health Employees Pension Plan v. McDermott 35-20327 Nova Scotia Health Employees Pension Plan v. McDermott 34-20327 Nova Scotia Health Employees Pension Plan v. McDermott 35-20327 Nova Scotia Health Employees Pension Plan v. McDermott 35-20327 Nova Scotia Health Employees Pension Plan v. McDermott 35-20327 Nova Scotia Health Employees Pension Plan v. McDermott McDermott... They assert... That it's undisputed that McDermott stock was not inflated premerger. And do you agree with that or not agree with that? The foundation of the court-upheld complaint is that the McDermott stock was inflated. In fact, our Scienter allegations included allegations that the defendants had sold McDermott shares at fraud inflated prices before the merger ever closed. That's directly counter to the proceedings. So what is the specific evidence that you're pointing to that the McDermott stock was inflated premerger? The court-approved damages methodology is the out-of-pocket methodology. It was approved twice in both class certification orders. Those rulings were not appealed. And in conjunction with this court's decision in US v. Olis, the general method for a calculating loss is the difference between the price paid for McDermott stock and the value of McDermott stock after ameliorative information would have been released. Here we have our trading records show an entry called a purchase asset. It was the acquisition at $517,000. NSF held those securities through all the corrective disclosures. There's an allegation of a 92-and-a-half percent drop over the course of those correctives. Our expert has already used the court-approved methodology from the class cert era to submit a full expert report where he calculated those inflation at between $14 and $16 a share, depending on the time period. So our method of showing McDermott inflation is the well-trodden out-of-pocket methodology. It uses the corrective stock drops. It then neutralizes for unrelated company information, general market declines, et cetera, and it uses that to estimate inflation at any given moment. That's true for any 10B case. Here, going back to my point, defendants conceded twice in their briefing to this court that pre-merger purchasers and converters are aligned in seeking to prove that McDermott's pre-merger statements were fraudulent and inflationary. They did so on their opening brief at page 43 and their reply brief at 18. These concessions fatally undermine any fundamental conflict arguments that they're going to make. Moreover, pragmatically speaking, there's no indication of any actual conflict. We've litigated every attempt by the defense to kill these claims for over six years. We took the case through the entirety of discovery, including after the class certification hearing happened, all the deposition discovery. We submitted expert reports on behalf of the entire class and after all of that, MR1 said we had represented the class skillfully and Order 1 found my firm, Pomerantz, to be adequate under Rule 23A4. It is just simply not the law that subclasses must be imposed for every potential differing interest. I can name innumerable ways that classes have differing interests. If you purchase between one corrective or after another, there's all manner and even in Deepwater Horizon, those class members, some of them were situated right on the Gulf Coast, some were inland more and there was differing assessments of how they might have been impacted by oil spill. The district court's imposition of subclassing along with an entire other unwarranted PSLRA statutory process lack the basis of a fundamental conflict and they were simply unwarranted. We seek a determination that it applied the wrong legal standard and vacating of the finding of fundamental conflict. Turning to my second point, affirmative defenses, the district court applied the wrong legal standard and abused its discretion by blurring defendant's burden to prove purported CB&I inflation which they claim exists, we think did not and there's no evidence of, as a predicate both for all of the arguments you're about to hear and for the district court's finding of a fundamental conflict and all the subclassing and remedies it imposed. Order 2 deleted Order 1's rulings that had correctly called that affirmative defense. There were not one, not two, but three times that ruling was made. ROA 11646, 11648, 11921 to 922. NSF's trading records here, just like this court said in Union Asset Management v. Dell, a quick look at the trading records is all you need to figure out in this sort of case if there's damage. NSF's trading records check all the boxes. There's an acquisition transaction recorded as a purchase asset at a share price of $20.67 and a total expenditure of $517,000. Those records show that the securities were held through every corrective that was alleged and that a 92.5% drop was alleged along with a declaration of worthless security when McDermott declared bankruptcy. The defendant's class certification argued that somehow there was their opposition somehow argued that there was still a benefit of some kind, but their bases for saying so were rejected. First, they argued CB&I would have been otherwise bankrupt, whatever that meant, because a bankruptcy we both know could be a reorganization of debt, etc., but that was countered by the S-IV proxy statement and the defendant's testimony and Mullen's testimony. They also argued that CB&I's stock was inflated before the frauding began, McDermott was untainted, and as noted before, that was rejected. The record evidence, again, shows no evidence of any overvalue at any point in time by CB&I, and defendants offered zero evidence. We are past the closure of discovery. Fact discovery fully ended, depositions discovery fully ended, expert reports submitted. They have never done anything at all to demonstrate any CB&I inflation. They've gotten to the point now in their briefing where they're saying, well, the amount doesn't matter. That was in the briefing before this court. That runs directly counter to the district court's iteration of a fundamental conflict, because the district court was thinking about the relative inflation levels. Their brief says the amount doesn't even matter. They instead rely on logical consequences. It must be so, but that's not sufficient. That is not sufficient to hit a fundamental conflict. Throughout the entire litigation, it was their burden. MR1 and Order 1 said it three times. It was clearly erroneous for Order 2 to blur those lines at this juncture, because, again, without that CB&I inflation, every argument we're talking about, the core rulings by the district court collapse. If nobody can prove CB&I was inflated by a certain amount, then there's no fundamental conflict at all. There's no standing argument. There's nothing that we're talking about today that exists. Significantly, all the arguments on cross-appeal fail for the same reasons, because our trading records, like those of every other class member, they show the purchase price or acquisition price and dates. They show the sale dates and prices. They can discern whether those securities are held past each of the corrective disclosures or any of them, and that is enough under Dura, under the court-approved damages methodology, under the oldest case of this jurisdiction, under the PSLRA look-back. All of those things are all you need to do to establish that you have damages, that you're a class member. There's no ascertainability problem. You just glance at the trading records. So all of the arguments collapse, both the standing argument, which was timely raised, and the ascertainability and the other arguments that we say were waived. I see that I have a minute left. I'd like to then just address, if I may, really quickly, the Rule 23F concept. Rule 23F establishes a straight line to this court. Unlike interlocutory appeals in other contexts, where the district court must first be asked permission to go to this court, 23F is straight to this court. Once that petition is filed, there is briefing occurring here. This court is charged first with deciding whether to accept the petition, and the argument you'll hear is, well, it wasn't accepted, so this is of no moment jurisdiction-wise. First, the rail freight case in the D.C. Circuit said that the petition filing was enough to confer jurisdiction, but it has to be from a policy level, because even if this court decided, we are not going to accept the appeal and go further in the briefing, that action is an outcome. It fixes the party's positions in time and forestalls any other interlocutory appeal of class certification. You can imagine, in other contexts, defending companies have a class certification order against them. They'd like to get an immediate interlocutory review. They initiate the process, and before this court can either weigh in and ask for more and determine important rulings of law or not, the district court might rewrite the order, and it could kick the can another six months, and it can do that again. That's not the law. This court's decisions in Dayton and Wooten say two courts should not have jurisdiction at once, with all the duplicative briefing, et cetera, that ensued. Thank you. Mr. Testillo, thanks very much. We'll see you back on rebuttal in a few minutes. Ms. Heffley, good afternoon. Welcome. Good afternoon, Your Honors, and may it please the Court. Amy Heffley with Baker Botts on behalf of Appellees, Cross Appellants, McDermott, as well as Mr. Dixon and Mr. Spence. A party has standing to pursue a Section 10b claim only if the alleged fraud made them worse off financially than they otherwise would have been, and that's the fundamental standing economic injury requirement that Nova Scotia and the other CB&I exchangers fail. They were not any worse off financially because of the alleged McDermott fraud. On the contrary, that alleged McDermott fraud, which Mr. Testillo didn't talk about it, but it's very important to understand, the alleged fraud was that McDermott didn't disclose in the merger announcement or in the period leading up to the merger that CB&I was, quote, Enron 2, that CB&I was basically bankrupt. Those are the words of the complaint. That CB&I had more than a billion dollars in undisclosed costs on its books, which were cooked. That CB&I's focus projects were an albatross on the rest of the business, and once the merger closed, they would take down McDermott. That's the alleged fraud in the complaint, and that alleged fraud kept CB&I's stock price from tanking. That is the only plausible inference you can draw from the pleaded theory. Had the merger announcement disclosed all of that alleged fraud, what would have happened to CB&I's stock price? It would have tanked, and the merger would not have gone through. That, in turn, is what allowed the CB&I exchangers to offload the alleged artificial inflation in CB&I's stock price that necessarily existed under the pleaded theory and gave them a lifeline to at least extend the timeline to bankruptcy. That's how the alleged fraud benefited the CB&I exchangers and why, under the analysis in this court's Earl v. Boeing, they do not have an economic injury from the pleaded theory. What is the actual specific evidence that the CB&I stock was inflated more than the McDermott stock? Your Honor, I want to be clear. You asked a great question earlier. Our argument has never been that McDermott stock was not inflated before the merger closed. It has always been that the stock was not inflated before the merger was announced. That is undisputed. That was admitted by Nova Scotia's expert. Nova Scotia's expert also admitted, and the district court's ruling cites his admission, that there was inflation in both McDermott and CB&I's stock price before the merger closed. It's not true that there was no evidence of inflation in CB&I's stock price. That was admitted by Nova Scotia's expert. More fundamentally, we think this is an inquiry the court should perform based on the pleaded theory of fraud, just like it did in Earl v. Boeing. In Earl v. Boeing, the court may remember passengers were alleging that they paid inflated prices for their flights on the MAX, and that if the defect had been disclosed about the MAX, they would have paid lower prices because demand would have plummeted and the airlines would have been forced to lower their prices. This court, looking solely at the pleaded theory in Judge Oldham's opinion, said, well, that rests on two implausible inferences. The first being that if the defect had been known, the airlines would have just kept flying the planes only at discounted prices, and also that the FAA would have allowed the airlines to keep flying the planes if the defect had been known. The court found that pleaded theory was implausible, and that what was far more plausible was that if the defect had been known, then there would have been fewer seats, which means prices would have gone up for the passengers, not down. And the court reached that conclusion even though the airline passengers had an expert who was saying, no, no, demand for those flights would have gone down. So our point is the court can just look at the pleaded theory, and there's no way around the pleaded theory that takes you to a world where it's even conceivable that McDermott's stock could have had more inflation than CB&I's. And that's because the CB&I problems, again, are what was allegedly undisclosed. So if CB&I was inflated, which it must have been under the pleaded theory, it's not possible that CB&I was in round two and had more than a billion dollars in undisclosed costs on its focus projects, which were an albatross on the rest of the business. It's not possible that CB&I's stock was not inflated in light of those allegations. That is the only logical consequence of the allegations. I suppose their theory is that the two companies faced inflation at different rates. I don't think that was their theory, actually, Your Honor. Let's put aside the preservation issue. What if that were their theory? Would that be plausible? It's not plausible on the pleaded theory here, and here's why. The allegation is that all the undisclosed problems are over here at CB&I, which means there's a ball of inflation hanging out in the CB&I stock price. Then when the mergers announced, they alleged that McDermott's stock price somehow became inflated at that announcement, but both stock prices went down, which means they must be claiming that McDermott's stock price would have gone down even more had the truth been revealed in the merger announcement. But it's not plausible that CB&I's stock price would have gone down by somehow less than that. If you take that ball of inflation, which is the source of the fraud, and McDermott then replicates, that inflation is replicated over at McDermott, it's physically and mathematically impossible that this inflation over at McDermott is bigger than the source from whence it came. Why is that? You're saying, I take it, just because one is merging into the other. Why does that valuation by the market have to be the same? The whole point of mergers is the potential for synergies to be unleashed and whatnot. Here, according to Nova Scotia's expert, the two stock prices traded in lockstep between the date of the announcement and when the merger closed. Whatever inflation got baked into McDermott's stock price, if any, on the merger's announcement, that necessarily carried over in the same ratio going forward to the closing because of Nova Scotia's own expert opinion. More importantly, he offered zero evidence that there was more inflation in McDermott than there was in CB&I. That's critical because the district court's finding that maybe it's possible there was more inflation in McDermott is not borne out either by the pleaded theory or by the actual evidence. I take you've got a pleading issue and an evidentiary issue, but on a purely economic conceptual issue, wouldn't you agree that it's certainly possible? No. No, we don't agree it's possible. Again, that's something that even Nova Scotia's own expert admitted on cross-examination. The critical quote, I want to make sure I get it right for you, he was asked on cross-examination this. Mathematically, you can't have a situation where more of the inflation of the inflated target, so here's CB&I, you can't have a situation where more of that inflation is embedded in the buyer. He agreed. That evidence shows that there could not have been more inflation in McDermott's stock price. So you have the pleaded theory, the evidence, as well as admissions. But we all know that the whole can be worth more than the sum of its parts, and presumably this is why companies buy one another. They think that they can do more with the assets. But here you have to go back to what is alleged to be fraudulent. So the synergies statement, for example. The alleged fraud there is not that McDermott said we expect to have synergies. The alleged fraud is you didn't also say those synergies will never be realized because there is a billion dollars in undisclosed book costs on CB&I's books that once the merger closed, we're going to take on. It's mathematically not possible and physically not possible for this ball of inflation to have grown when it ended up over here. In fact, it's the exact opposite. As we demonstrated with those charts, those little pie graphs that are in our brief, if you take a ball of inflation at CB&I and you have the, according to the complaint, less capitalized, basically bankrupt CB&I with that inflation, and you move it over, you replicate it in the McDermott, which post merger was certainly bigger. According to the complaint, it was a healthy, profitable company before the merger. So if you take that amount of inflation and you put it over here, necessarily those CB&I shareholders are sharing the alleged inflation that they had with a broader group of constituents, meaning it was diluted across those constituents, meaning the CB&I exchangers are left with less fraud-induced inflation than they had before under their theory. And that's why, again, we think it is not plausible from the pleaded theory or the evidence that they didn't benefit. Think about what would have happened if the merger announcement or in the period leading up to the closing, the things had been disclosed that the Nova Scotia says should have been disclosed. If McDermott had disclosed, there's a billion dollars in undisclosed costs on CB&I's books. CB&I is basically bankrupt. CB&I is an en rante, and these projects are in albatross. If that had come out before the merger was announced, what would have happened? The only plausible, excuse me, before the merger closed, the only plausible inference is that CB&I's stock price would have tanked on that news, and more than McDermott's stock price, because at least McDermott had the option to pay the termination fee, the $65 million break fee, and walk away from the deal. CB&I, according to the complaint, had no other options. I know Mr. Ticillo mentions the proxy and the possibility of selling the Lemus technology business, but the reality is the proxy was crystal clear that McDermott had not received any bids for that business that would have left it with any liquidity going forward, and the benefit of the proceeds from that sale would have gone to benefit primarily the creditors and no one else, meaning it's inescapable that the CB&I shareholders held an interest in something that it turns out was basically bankrupt. If that had all come out, you have to assume the merger would not have happened at all, certainly not on an exchange ratio where CB&I shareholders got a 3% premium to the then trading stock price of CB&I, and instead what are they left with? They're left with shares in a basically bankrupt CB&I. That is why they necessarily benefited from the exchange, and that's our fundamental point on standing. If I can turn briefly to conflicts, because that's another—I was going to lead you there. What do you propose that we do with these dual status plaintiffs? Is there any possible way to divide them without conflict? As we pointed out, it does create a serious ascertainability problem. You can put yourself in the shoes of whoever has appointed class counsel for the McDermott purchasers. If they don't know if those dual class citizens in their subclass are more like true purchasers who don't have to deal with this benefit problem, or more like CB&I exchangers who don't really want this offset issue even brought up as a defense, much less in trying to prove their claim, you can imagine the ethical dilemma that that McDermott purchaser counsel faces. I will say— What's the solution? How do you divide them without conflict? I think this court doesn't have to reach that decision yet, because the district court only certified the class of CB&I exchangers. If this court decides, as we believe it should, that those CB&I exchangers do not have standing, then they're out. We are not asking this court to dismiss any of the McDermott purchasers. That issue will go forward as the district court has laid out with the new lead plaintiff process. We don't think the court has to reach that issue, but it's certainly something that may and could come up on the remand, where the district— In connection with that, why do you maintain that a fundamental conflict exists between the purchasers and the exchangers? I'm happy to explain that. I think the fact that we're even having this argument exemplifies that conflict. If you're a true McDermott purchaser, and you know that McDermott's liabilities have been discharged in the bankruptcy, everyone agrees that's the case, and any recovery against McDermott will be limited to its director and officer liability insurance policies. If that's the case, then the McDermott purchasers are incentivized to say, those CB&I exchangers, they benefited. They got out of a basically bankrupt CB&I and had a lifeline here. They should not be in this class. But Mr. Ticillo and Nova Scotia will never make that argument. They can't make that argument, because that defeats their standing. That is the fundamental conflict. It is exemplified or exacerbated by the limited pie scenario. But even if you didn't have the limited pie scenario, I'll submit to you that there's still a fundamental conflict in how this case would be prosecuted. Someone representing the McDermott purchasers would want to double down on the theory of fraud pleaded in the complaint. They would want to say, CB&I has a ton of inflation. That wasn't disclosed to us. McDermott overpaid for CB&I. We were injured by that. Now, we don't agree with that theory of fraud. We don't think it makes any sense at all that the McDermott CEO and CFO would have taken McDermott down a suicide mission of taking on the CB&I knowing that these were the problems and hiding them from the public. We don't agree with that theory, but we can at least understand why it's cogent and something someone would want to present to a jury. Turn that around for the CB&I exchangers. You have Mr. Tisillo up here telling you, no, CB&I wasn't inflated. Well, if CB&I wasn't inflated, if this fraud that McDermott allegedly perpetrated is not about CB&I, then what is it? He didn't tell you what the theory of fraud is that a CB&I exchanger would pursue as trial, and I'll submit to you because there isn't one that would make any sense to a jury. We think, again, the limited pie scenario is what really brings this conflict to a head, and it's why you can't just punt until some later day trying to figure out who's in the class and who's not in the class when we get back to the district court. It really is a fundamental conflict that exists now, and unfortunately, it's something that is only coming up now because of the way the CB&I exchanger, Nova Scotia, deceived the court, frankly, into believing that it was a McDermott purchaser, trying to blend in with the rest of the McDermott purchaser crowd only for it to—saying year after year whether it was in the lead plaintiff motion or in the complaint or in the class certification motion and the accompanying declaration, if they had been more forthcoming about the fact that they were really a CB&I exchanger, I do not think they ever would have been appointed lead plaintiff. They never would have commandeered this class, and we would not have gone down this detour that the district court correctly recognized has taken a ton of time and effort to litigate, which again goes back to why there's a conflict here. This is not something that we would be spending any time on but for the fact that we have these CB&I exchangers in the class. So since both the exchangers and the McDermott purchasers, they're trying to prove that McDermott made these misrepresentations, why would it not help smooth out the conflict by just bifurcating the liability part of the trial? Then you can tackle damages for the purchasers and the exchangers separately. Would that help avoid any kind of conflict? I don't think it would, first of all, because fundamentally the CB&I exchangers have to prove an economic injury to even have standing, and as this court recognized in the Bertulli decision, which I believe Judge Wiener was on the panel of, standing is something that has to be decided before class certification. So the fact that they don't have an economic injury, that is part of their liability case, and that's why that has to be dealt with now. But I also think, again, it's not about a bifurcation issue so much as what do these classes look like today? And so I don't think it helps to say you can have one lawyer representing two groups of people arguing completely different things throughout the whole course of the case, when again, what I think someone truly, zealously advocating for the McDermott purchasers is that the CB&I exchangers have no economic injury and are out of this lawsuit. Why wouldn't the other Nova Scotia proposed alternatives work? Well, so again, I don't think the court has to decide that because the district court did not abuse its discretion in the path it chose to take. But, you know, for example, saying, as Nova Scotia's counsel did to the district court, don't you worry about it. I'm going to refile a motion for class certification, and I, the lawyer, will have two different clients, each of whom is completely opposed to one another. I don't think the district court abused its discretion in not going that path. The district court also didn't abuse its discretion in not just selecting the proposed plaintiff, additional plaintiff, Pontiac, and its counsel, Robbins-Geller, that had initially been proposed as additional counsel in the supplement by Nova Scotia. As we laid out in our brief, it's very unclear why the true purchaser, Pontiac, would have dropped out of the case unceremoniously only to come back in later. But again, we don't think the district court abused its discretion in not going that path. Which aspects of the district court's order are beyond the scope of the 23F petition? I think the aspects that are clearly before the court are the standing issue for the CB&I exchangers and the fundamental conflict finding in the subclassing that the court reached in the class certification order. Those are before the court. I think everything else, including what was brought up in the first district court's order that was withdrawn perfectly appropriately within the court's discretion, those are not before the court. If there are no other questions, thank you. Thank you, Ms. Heffley. Mr. Ticillo, welcome back for five minutes. Defense counsel has misstated and oversimplified the fraud. We've pled three prongs of fraud that continue from the premerger period into the postmerger period seamlessly, and they all relate to postmerger McDermott, its abilities, its capabilities, its balance sheet. For example, there's a technology business fraud. That concerned postmerger McDermott's ability to, through synergies, et cetera, unlock $40 billion in business from CB&I's technology business, Lummis, which undisputedly was worth $2 to $2.5 billion, more than the price, frankly, that McDermott paid for all of CB&I. That has nothing to do with issues at CB&I, purported problems, et cetera. Ms. Heffley selectively cited a few of the CW statements about Enron, this and that. That was the surmise of CWs who worked at CB&I at the time, but she has then taken a leap in saying, look, it's simply not possible. If all these ills were disclosed, the stock price would have tanked. That's a major jump. CB&I had written down those very projects for four consecutive quarters, which we say coincide with a 40% decline in the year before the merger alone, 80% overall, and a diminishment of NSF's original CB&I investment by $600,000. The market could very well have said, you know what? CB&I sort of is what it is. We're giving it a decreased enterprise value based on Lummis, and there's no more bleed here coming from the projects. Nobody knows, because their expert wasn't even asked to look and never did. Meanwhile, the defendants testified there's no CB&I inflation. Mullen testified there's no CB&I inflation. Spence testified, hey, we tracked CB&I's price very closely, daily, to determine whether the ratio should be set one way or another. He said that we believe CB&I was valued appropriately in the stock market, and he held that opinion then and even today. Even knowing everything that's come out from this lawsuit today, he still believes it was appropriately valued. Our expert did not make any of the concessions that were said before the Court here. For example, the testimony that is cited, it's on ROA 14020 to 121, began with a hypothetical. Defense counsel started by saying, let's say the merger's announced. There's two public companies. Everybody's in agreement. 100% chance that the deal is done, and one company's inflated and one company is not, and then engaged in a series of hypothetical questions. The word CB&I, the word McDermott weren't used. Our expert did not analyze CB&I's stock price. The idea of lockstep trading, we briefed that. The page is ROA 12559, and we blew up the stock chart and showed days where, I think along the lines of Judge Ho's questioning, the two stocks are going in opposite directions before the merger, and there's a lot of reasons why. There was a competing buyer that came along for a while, etc. So nobody, nobody, our expert, their expert, nobody analyzed CB&I's stock price. That gets back to the point of burden. This whole concept that CB&I even was overvalued, that it was relevant, etc., is an affirmative defense. This Court's cases are legion, saying offset or reduction of damages is an affirmative defense. As to the point of whether or not there's these three buckets of investors, along the way, it's been alluded to, we couldn't have made that argument. We defendants couldn't have made that argument until the memorandum entered. That is just categorically untrue. Their expert report, their opening expert report, page is ROA 8459 to 8461, devoted three pages and a chart to creating these three buckets, talking about them, etc. That argument was available then. It was not made. It's waived. But regardless, ascertainability is not determined at this stage anyway, and even if it were, it doesn't matter if an investor has shares in both buckets. The absent class members are not scrutinized under Rule 23 like class representatives. Most of them don't know this case exists. They would simply put in their trading records if and when there's a point of recovery, and those trading records would be sort of mechanically applied to either have damage or not. I would be remiss if in the last 30 seconds I did not address the whole deception concept. NSF's CEO was deposed about the inadvertent mistake of calling something a purchase. Frankly, that aligns with SEC v. National, which says an exchange is a purchase, Supreme Court precedent. But he was deposed at length, and they don't even mention his answers. Instead, there's a sort of ad hominem attack that has evolved over time and only after that memorandum entered. Dr. Stilwell, thank you very much. That will conclude argument in the last case of the last day of the week. So everything is submitted, and the Court will stand in recess. Thank you.